# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA**,

   Plaintiff,

vs.          No. **CR 05-2602 MCA**

**JORGE MADROZA-ACOSTA and**
**PEDRO DELGADO,**

   Defendants.

## MEMORANDUM OPINION AND ORDER
## GRANTING MOTION TO SUPPRESS

  **THIS MATTER** comes before the Court on *Defendant Madroza-Acosta's Motion to Suppress* [Doc. 37], filed January 11, 2006, and Defendant Pedro Delgado's *Motion to Join in Defendant Jorge Madroza-Acosta's Motion to Suppress* [Doc. 40], filed January 19, 2006. On February 1, 2006, the Court held an evidentiary hearing on Defendants' motions in Albuquerque, New Mexico. Having fully considered the pleadings of record, the applicable law, the evidence and the arguments of counsel presented at the hearing, and being fully advised in the premises, the Court **GRANTS** Defendant Pedro Delgado's *Motion to Join in Defendant Jorge Madroza-Acosta's Motion to Suppress* and **GRANTS** *Defendant Madroza-Acosta's Motion to Suppress* based upon the following findings of fact and conclusions of law.

## I.      **FINDINGS OF FACT**

1.      Gary Burns is a retired member of both the United States Army and the United States
        Coast Guard.  [Suppression hearing testimony of Gary Burns].

2.      As a member of the Coast Guard, Mr. Burns engaged in search and rescue missions,
        pollution patrols, and drug and law enforcement activities.  [Id.].

3.      During his time with the Coast Guard, Mr. Burns occasionally came into contact with
        illegal immigrants, usually rescuing them from the water.  [Id.].

4.      Mr. Burns currently lives part time in Phoenix, Arizona and part time in Oklahoma.
        [Id.].

5.      On November 1, 2005, Mr. Burns was driving through New Mexico on Interstate 40
        from his home in Oklahoma to his home in Phoenix.  [Id.].

6.      While en route, Mr. Burns stopped at a convenience store near mile marker 267.
        [Id.].

7.      Mile marker 267 is near Santa Rosa, New Mexico.  [Id.].

8.      In the convenience store parking lot, Mr. Burns parked his vehicle next to a white
        van with dark tinted windows.  [Id.].

9.      The van caught Mr. Burns's attention because it had "blacked out" windows, and Mr.
        Burns had not seen a van like it before.  [Id.].

10.     Mr. Burns described the van as being a one-ton, white, Ford F-350 van.  [Id.].

11.     When Mr. Burns's traveling companion entered the convenience store to use the

restroom, Mr. Burns also went in to kill time.  [Id.].

12.    Although Mr. Burns originally had intended to make a purchase, he changed his mind

when he saw long lines at the cash register.  [Id.].

13.    As Mr. Burns waited in the store, he noticed two men standing inside the store.  [Id.].

14.    One of the men specifically caught Mr. Burns's attention because he was "shorter in

stature," wore a "Boonie" hat rolled up on the sides, and had on his belt what Mr.

Burns assumed, but was not certain, was a small knife.  [Id.].

15.    A Boonie hat is a military-type soft hat that curls up like a cowboy hat.  [Id.].

16.    Mr. Burns's attention was also drawn to the men because, in contrast to the other

people in the store, who were shopping, using the restroom, and paying for

purchases, these two men were not shopping or "doing anything."  [Id.].

17.    From the men's stance, Mr. Burns believed that they were "watching everything,"

and that they were guarding other people.  [Id.].

18.    Mr. Burns attached significance to the fact that the men appeared to be guarding

other people because Mr. Burns has stood guard in the past.  [Id.].

19.    From where they stood inside the store, Mr. Burns believed that the two men could

see everyone in the store as well as the van parked outside.  [Id.].

20.    Although Mr. Burns did not hear the men speak, he believed they were Hispanic.

[Id.].

21.    Because Mr. Burns did not hear the men speak, he did not know whether they could

or could not speak English.  [Id.].

22.     With the foregoing observations of Mr. Burns while he remained inside the store, Mr.

        Burns was not overly suspicious of the two men or other activity.  To use his own

        words, "I still didn't register everything at that point."   [Id.].

23.     Mr. Burns then left the store and walked toward his vehicle.  [Id.].

24.     In front of Mr. Burns's vehicle, near the entrance to the store, was a newspaper stand.

        [Id.].

25.     Mr. Burns did not buy a newspaper, but he read the large print on the front page.

        [Id.].

26.     The article appeared to be about illegal immigrants.  The thrust of the article or

        headline that Mr. Burns read was that once an individual illegally crosses the border

        and is traveling in the United States, that individual's chances of being caught are

        about the same as being struck by lightning.  [Id.].

27.     Mr. Burns then observed people enter the white van parked beside his vehicle.  [Id.].

28.     Mr. Burns's suspicions were raised when he saw that the van door would be opened

        only wide enough to let in one person at a time.  [Id.].

29.     It was not possible for Mr. Burns to see inside the van.  [Id.].

30.     Given the way they were opening the van door, Mr. Burns believed that the

        individuals riding in it were trying to hide something.  [Id.].

31.      After the two men from the store entered the van, the van drove away.  [Id.].

4

32.     At this point, Mr. Burns decided to write down the license plate number of the white van.  [Id.].

33.     Mr. Burns also noticed that the tires of the van appeared to be "swelled out like they were overloaded or something . . . ."  [Id.].

34.     Mr. Burns estimated that the van was carrying 18 or 19 people.  [Id.].

35.     Mr. Burns believed that the van looked as if it could have transported 10 or 12 people.  [Id.].

36.     Mr. Burns's traveling companion got back into Mr. Burns's vehicle and Mr. Burns began driving.  [Id.].

37.     Once back on the highway and having thought about what he had seen, Mr. Burns unsuccessfully attempted to telephone Border Patrol or police authorities.  [Id.].

38.     Mr. Burns's decision to make this call was prompted by the front-page newspaper article he had just read.  [Id.].

39.     Mr. Burns testified that he would not have contacted authorities as he did except for his having read the newspaper outside the store.  To use his words, "*It was all suspicious and truthfully I probably wouldn't have done anything except the newspaper was right there saying it to me.*"   [Id.].

40.     Mr. Burns concluded that the van occupants were illegal immigrants because "*I live in Phoenix, Arizona right now and have lived in Houston, Texas and been around a lot of people.  You know, I guess it's an assumption, the appearance to me from what*

*I'm used to, that was what my judgment was*."   [Id.].

41.   Mr. Burns ultimately called the New Mexico State Police.  [Id.].

42.   A tape recording of a portion of Mr. Burns's conversation with the New Mexico

State Police dispatcher, Annissa Ray, shows that:

a.   Mr. Burns identified himself to the dispatcher as "Gary;"

b.   Gary stated that he would like to report "a lot of illegals traveling down the

highway;"

c.   Gary informed the dispatcher that he was in Santa Rosa, near mile marker

267; and

d.   Gary stated that he was reporting about 18 or 19 people headed westbound in

one van and that he "had the tag number and everything."

[Exhibit 2].

43.   The police recording equipment malfunctioned such that not all of Mr. Burns' s

conversation with dispatcher Ray was recorded.

44.   Mr. Burns *testified* that he provided the dispatcher with the following information:

license plate number, description of a white Ford van, blacked out windows,

California plates, heading west, 18 or 19 people inside, one with a knife on his belt

and Boonie hat.  [Testimony of Gary Burns].

45.   Mr. Burns *testified* that he also told the dispatcher that one of the individuals

appeared to be guarding the others, wore a Boonie hat, and had what looked like a

6

knife on his belt.  [Testimony of Gary Burns].

46.     Such information is not contained on the tape recording of his call nor on the CAD

report.  In the Court's view, this raises an issue of the reliability as to the witnesses'

trial testimony with respect to the *entire substance* and detail of Mr. Burns's

comments to the dispatcher at the *time* of his call.  In this regard, the Court notes that

Officer Healy never articulated or repeated, as a basis or reasons for his decision to

stop the van, the facts involving "guarding," "blackened windows," the "Boonie" hat,

or the presence of a "knife".

47.     Mr. Burns testified that, in addition to his name, he provided the dispatcher with his

telephone number so that the authorities could contact him.  [Id.].

48.      A computer aided dispatch—or CAD—report reflecting the information provided

by Mr. Burns was entered into the computer of the New Mexico State Police at its

Albuquerque office.  [Exhibit 1].

49.     Carmen Leyba, communications supervisor for the New Mexico State Police District

5 in Albuquerque, initiated the CAD report at 12:46 p.m. on November 1, 2005.

[Id.].

50.     Ms. Leyba supervises all eight dispatchers at District 5.  [Id.].

51.     Although Ms. Leyba entered the CAD report, she was not the dispatcher who spoke

to Mr. Burns when he telephoned.  At no time did Ms. Leyba speak to Mr. Burns.

[Suppression hearing testimony of Carmen Leyba].

7

52.   Ms. Leyba's "normal" dispatcher was out on November 1, 2005 and "trainee" dispatcher, Annissa Ray, took Mr. Burns's call.  [Id.].

53.   When a call is made to District 5, the dispatcher normally tries to get the name of the reporting party, his or her call-back number, location, and a brief description of the activity being reported. [Id.].

54.   In the case of Mr. Burns's call, the CAD report shows that the call was reported at 12:46 p.m., and that:

a.    the computer assigned the call an incident number;

b.    the activity being reported was UAD, or "undocumented aliens";

c.    the location of the incident was Interstate 40 mile marker 267;

d.    the van in question was headed westbound;

e.    unit 246, Officer Sean Healy, was assigned to investigate;

f.    Officer Healy was provided with a description of the van and its license plate number;

g.    the van was identified as a white 2004 Chevy van, California license 5NVY479;

h.    the registered owner of the van was Juan Perez;

i.    Officer Healy asked that Border Patrol be contacted; and

j.    Officer Healy asked that District 11 in Socorro, New Mexico be contacted in case the van turned south and headed in that direction.

[Id.; Exhibit 1]

55.    Although the CAD report suggests that Ms. Leyba as the recipient of Burns' call, in fact the call was taken by dispatcher trainee Ray.

56.    The CAD report is silent as to any reason or reasons proffered by Mr. Burns regarding his suspicions that the occupants of the van were non-citizens or illegally present in the United States.

57.    The CAD report also shows Mr. Burns's first and last names, as well as his cellular telephone number.  [Exhibit 1].

58.    According to Ms. Leyba, the CAD report shows more information than can be heard on the tape recording because the recording equipment malfunctioned.  [Testimony of Carmen Leyba].

59.    According to Leyba, there were a minimum of three telephone conversations dealing with this incident, only one of which (the Burns-Ray call) was only partially recorded due to equipment malfunction.

60.    State Police District 5 uses an old Dictaphone recorder that is faulty and does not work properly.  [Id.].

61.    Ms. Leyba also experienced problems with the computer system at all relevant times.

62.    Ms. Leyba contacted Officer Healy by telephone.  [Id.].

63.    There was no recording made of the dispatcher's conversation with Officer Healy.

64.    Information is usually relayed by telephone rather than by radio dispatch when an

officer is in his or office at the time of contact.  [Suppression hearing testimony of Sean Healy].

65.   Officer Healy was in his office in Edgewood, New Mexico, when he was called by dispatch.  [Id.].

66.   Officer Healy was told over the telephone that an individual had observed an enormous number of people enter a white van with California license plates at approximately the 267 mile marker on Interstate 40, and that the individual was concerned that these people were undocumented immigrants.  [Id.].

67.   Other than the license number and location, no other specific information was conveyed to Officer Healy by the dispatcher.

68.   Officer Healy was dispatched to investigate the matter.  [Id.].

69.   Some information that Ms. Leyba claims to have relayed to Officer Healy was not included in the CAD report.  [Testimony of Carmen Leyba].

70.   Although Ms. Leyba told Officer Healy that the van in question had dark tinted windows, that information is not in the CAD report.  [Id.].

71.   Because dispatcher Ray was in training, she would place Mr. Burns  on hold and relay his questions and information to Ms. Leyba, who would then instruct Ms. Ray as to what she should tell Mr. Burns and what further information she should request.  [Id.].

72.   Because Ms. Ray had just started work a week earlier and had neither the training nor

the access rights to generate a CAD report, Ms. Leyba created the report.  [Id.].

73.   Because Ms. Leyba was working by herself, had other responsibilities, and at the same time was responsible for the trainee, she was not immediately able to enter all information into the CAD report.  [Id.].

74**.**   Because of the somewhat disorganized manner in which the dispatcher's office operated that day, the CAD report is limited in its content.

75.   Officer Healy was not told *why* the reporting individual believed the van passengers were illegal immigrants.  [Testimony of Sean Healy].

76.   After receiving the telephone call, Officer Healy got into his patrol car and began driving eastbound on Interstate 40.  [Id.].

77.   While he was driving, Officer Healy received more information via radio verifying that he was in search of a white Chevy van with dark tinted windows and California license plates.  [Id.].

78.   Officer Healy then asked for, and was provided with, the van's license plate number. [Id.].

79.   As he was driving, Officer Healy saw the van at either mile marker 201 or 203.  [Id.].

80.   The van was traveling westbound.  [Id.].

81.   Officer Healy turned his vehicle around and began to follow the van.  [Id.].

82.   Officer Healy noticed that

    a.   the van was traveling about 65 miles per hour in a 75 mile-per-hour zone;

    b.      the driver looked back at Officer Healy once or twice; and

    c.      the van had opaque, dark tinted windows.

[Id.].

83.    Officer Healy sees many vehicles with dark windows and does not believe such vehicles are unusual.  [Id.].

84.    Officer Healy followed the van for about four miles.  [Id.].

85.    Officer Healy does not believe it is unusual for a driver to become nervous upon realizing that he is being followed by a state police officer.  [Id.].

86.    The van was not speeding or being driven erratically.  [Id.].

87.    The van exited the highway at mile marker 197 and, driving cautiously, entered the town of Moriarty, New Mexico.  [Id.].

88.    The van pulled into the parking lot of Lisa's Truck Stop.  [Id.; Exhibit 1].

89.    When the van headed toward the fuel center, Officer Healy engaged his emergency lights and the van came to a stop.  [Testimony of Sean Healy].

90.    From what Officer Healy could see, the driver of the van operated the vehicle in a normal manner consistent will all laws.  At no time did Officer Healy observe any moving violations or any other type of problem with the vehicle's condition or the manner in which it was being operated.  During his testimony Officer Healy did not express any concern about the condition of the van's tires.

91.    Officer Healy stopped the van because of *"the reasonable suspicion that the*

*concerned citizen had,"* but failed to articulate *why* he believed the citizen's suspicion was reasonable.

92. When he stopped the van, Officer Healy knew nothing about Gary Burns. [Id.].

93. When Officer Healy stopped the van, he asked the driver for license and registration, which the driver provided. [Id.].

94. Officer Healy also asked the front-seat passenger for identification, which the passenger provided. [Id.].

95. At that time, Officer Healy did not ask anyone else in the van for identification. [Id.].

96. Officer Healy waited for backup officers from Moriarty and Torrance County to arrive. [Id.].

97. Officer Healy decided to wait for backup because of the large number of allegedly undocumented immigrants in the van. [Id.].

98. Once backup officers arrived, Officer Healy asked the van passengers for identification, which they were unable to produce. [Id.].

99. When Officer Healy asked the driver where they were coming from, the driver responded, "Houston." [Id.].

100. In response to further questioning, the driver told Officer Healy that they were headed to Los Angeles. [Id.].

101. As a state police officer, Officer Healy has made at least a dozen stops involving illegal immigrants. [Id.].

102.  Based on Officer Healy's experience, California is a source and destination point for illegal immigrants.  [Id.].

103.  Officer Healy continued his investigation, but did not read anybody their *Miranda* rights.  [Id.].

104.  Officer Healy then contacted his dispatcher, who contacted Border Patrol.  [Id.].

## II.    LEGAL ANALYSIS AND CONCLUSIONS OF LAW

### A. Legal Standard

The dispositive question before the Court in this case is whether Officer Healy had reasonable suspicion under the totality of the circumstances to effect the stop of the van. Those circumstances include not only what Officer Healy observed prior to effecting the stop, but also what information had been relayed to the State Police dispatcher by citizen Burns.

Because Officer Healy engaged his lights and siren prior to Defendants' van having come to a complete stop, the Government concedes that Defendants were detained for investigative purposes.  [Doc. 41 at 4].  An investigative detention, or Terry[1] stop, although a seizure within the meaning of the Fourth Amendment, need not be supported by probable cause. Rather, "[a]n investigative detention is justified where specific and articulable facts and rational inferences from those facts give rise to reasonable suspicion that a person has committed or is committing a crime."  United States v. Espinosa, 782 F.2d 888, 890 (10th

---

[1] Terry v. Ohio, 392 U.S. 1 (1968).

Cir. 1986).  "Where the historical facts giving rise to the stop and detention are undisputed, the only question is one of law, namely, whether the stop and detention, considered in light of the totality of the circumstances, were reasonable."  United States v. Edgerton, --- F.3d ---- (10th Cir. 2006).  The reasonableness of a stop is evaluated by asking whether (1) the stop was justified at its inception, and (2) the detaining officer's actions were reasonably related in scope to the circumstances which justified the interference in the first place. United States v. Alvarez, 68 F.3d 1242, 1244 (10th Cir. 1995).

"At both stages, the reasonableness of the officer's suspicions is 'judged by an objective standard taking the totality of the circumstances and information available to the officer[] into account.'"  United States v. Johnson, 364 F.3d 1185, 1189 (10th Cir. 2004) (quoting United States v. Lang, 81 F.3d 955, 965 (10th Cir.1996)).  Additionally, "courts must view the officer's conduct through a filter of 'common sense and ordinary human experience[.]'"  Alvarez, 68 F.3d at 1244 (quoting United States v. Melendez-Garcia, 28 F.3d 1046, 1052 (10th Cir.1994)).   Such an approach is intended to avoid the second-guessing of police officers' decisions, as well as to "accord appropriate deference to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions[.]"  Alvarez, 68 F.3d at 1244 (citing United States v. Lopez-Martinez, 25 F.3d 1481, 1484 (10th Cir.1994)).  Given that an officer's specific articulable facts, when viewed in isolation, will often comport with general notions of innocent travel rather than criminal activity, the job of the Court is "not to pigeonhole each purported fact as either

consistent with innocent travel or manifestly suspicious. Rather, the reasonable suspicion calculus turns on whether the specific articulable facts, when viewed together through the lens of a reasonable law enforcement officer, justified a brief roadside detention to determine whether" the suspected criminal activity was, in fact, occurring.  Lopez-Martinez, 25 F.3d at 1484.  With this standard in mind, I now consider the issue presented under the facts of this case.

**Defendants' Contentions**

Defendants make two arguments in support of their motion to suppress, both of which are inapposite.  Citing United States v. Brignoni-Ponce, 422 U.S. 873 (1975) and United States v. Venzor-Castillo, 991 F.2d 634 (10th Cir. 1993).  [Doc. 38 at 1-3], they argue first that the search of the van was not authorized under 8 U.S.C. § 1357(a)(3)[2] because at the time it was stopped, the van was more than 200 miles from the United States/Mexican border, was not on a direct route to the border, and was traveling a road necessitating

---

[2]  That statutory section provides that

> [a]ny officer or employee of the [Immigration] Service authorized under regulations prescribed by the Attorney General shall have power without warrant . . . within a reasonable distance from any external boundary of the United States, to board and search for aliens any vessel within the territorial waters of the United States and any railway car, aircraft, conveyance, or vehicle, and within a distance of twenty-five miles from any such external boundary to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States . . . .

8 U.S.C. § 1357 (a)(3).

passage through a number of towns and cities before reaching the border.  For these reasons they contend that law enforcement agents lacked reasonable suspicion to believe that the van and its occupants were engaged in some sort of criminal activity.  Defendants also maintain that reasonable suspicion was lacking because any suspicion of criminal activity was based on an *anonymous tip* from a  citizen who reported seeing 18 people at a convenience store whom he believed to be illegal immigrants.  Defendants contend that because an *anonymous* tip inherently lacks any indicia of reliability, it was insufficient to create the reasonable suspicion necessary to support the stop of the van.  [Id. at 3-5].

In the Court's opinion, the arguments of Defendants are misplaced.  The evidence adduced at the hearing disclosed that the United States Border Patrol did not effect the stop. It is uncontested that that agency played no  role in making the stop.  The stop was effected by the New Mexico Department of Public Safety on the basis of a tip provided by citizen Gary Burns.  Because the stop did not involve the Border Patrol, the principles announced in Brignoni-Ponce and Venzor-Castillo, relied upon by Defendants as they concern a border-patrol stop, are inapplicable.  Defendants' anonymous-tip argument fails for the simple reason that the tipster in this case was not—and made no attempt to remain—anonymous. The reliability concerns that arise in the context of tipsters are discussed more fully in the following section.

## Informant Reliability

The uncontested evidence adduced at the hearing disclosed that the tip was not

anonymous.  The Government contends that reliability of the informant, Gary Burns, follows from the fact that Mr. Burns gave the New Mexico State Police dispatcher his full name and telephone number and provided a specific description of the van, which included its color, notable dark windows and specific California license plate numbers. Officer Healy corroborated the tipster's information through his own observations of the van's color, windows, and license plate numbers as he followed it down the highway.  [See generally Doc. 41].

However, the resolution of the merits of this case does not depend solely upon the reliability of the informant, Mr. Burns.  Rather, as noted above, it depends upon whether Officer Healy had reasonable suspicion to effect the stop, based upon his own observations or upon information conveyed to the dispatcher by Mr. Burns.[3]   In other words, an examination must be made as to the substance or content of Mr. Burns's call.

In their brief, Defendants cite  Florida v. J.L., 529 U.S. 266 (2000), which held that

---

[3]  The information conveyed to the dispatcher is relevant under the  "fellow officer" rule. That rule provides that "law enforcement officers may pool their information and that reasonable suspicion is to be determined on the basis of the collective knowledge of all the officers involved." United States v. Hinojos, 107 F.3d 765, 768 (10th Cir. 1997) (citing  United States v. Morgan, 936 F.2d 1561, 1569 (10th Cir.1991)).  Although the law enforcement agent who relays the information leading to a stop must have a reasonable suspicion sufficient to justify the stop, the officer who acts in reliance on that information is not required to have personal knowledge of the evidence creating a reasonable suspicion.  See United States v. Hensley, 469 U.S. 221, 231 (1985) (where "wanted" flyer or bulletin has been issued on basis of articulable facts supporting reasonable suspicion that wanted person has committed an offense, then reliance on that flyer or bulletin justifies stop, even if officer effecting stop is unaware of underlying facts creating reasonable suspicion).  Radio dispatchers are included in the group of law enforcement officers who may pool information.  Hinojos, 107 F.3d at 768  (citing United States v. Cutchin, 956 F.2d 1216, 1217-18 (D.C.Cir.1992)).  Thus, Officer Healy was entitled to rely on information pooled by the dispatchers in this case.

an anonymous tip must exhibit some indicia of reliability in order to support a reasonable suspicion of criminal activity. [Id. at 3-4).  Although evidence at the suppression hearing revealed that Gary Burns was not an *anonymous* caller, Defendants continue to argue  that J.L. controls  because the court there cautions against using hindsight, or the mere fact that an otherwise unreliable tip happened to be accurate, to establish reasonable suspicion.

In J.L., officers of the Miami-Dade (FL) Police Department stopped, frisked, and seized a gun from J.L. on the basis of nothing more than an anonymous tip that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a concealed weapon.  J.L., 529 U.S. at 268, 270.  The trial court granted J.L.'s motion to suppress, but the intermediate appellate court reversed.  The Florida Supreme Court quashed the decision of the intermediate appellate court, concluding that anonymous tips are "are generally less reliable than tips from known informants and can form the basis for reasonable suspicion only if accompanied by specific indicia of a subject's 'not easily predicted' movements."  Id. at 269 (*quoting* J.L. v. State, 727 So.2d 204, 207 (1998)).

The United States Supreme Court affirmed, holding that an anonymous tip lacking indicia of reliability does not justify a stop and frisk.  J.L., 529 U.S. at 274.  That the tipster's allegation about the gun ultimately turned out to be correct was irrelevant, as "reasonableness of official suspicion must be measured by what the officers knew before they conducted their search."  Id. at 271.  The J.L. tip, however, lacked even a "moderate indici[um] of reliability[,] provided no predictive information[,] and therefore left the police

without means to test the informant's knowledge or credibility." Id.  Additionally, the caller in J.L. neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L.  Id.

Specifically rejecting the argument that the tip in J.L. was reliable because there was in fact a young black male in a plaid shirt standing at a particular bus stop, the Court explained that that type of tip, while useful in helping police identify the person the tipster means to accuse, is not necessarily reliable for Fourth Amendment purposes if it does not also show the tipster's knowledge of concealed criminal activity.  This is because "[t]he reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person."   J.L., 529 U.S. at 272.  J.L. is instructive to the case at bar for the foregoing reasons.

In the present case Gary Burns made no attempt to remain anonymous when he called the New Mexico State Police.  However,  Defendants submit that  J.L. controls because, while the tip ultimately proved to be accurate, at the time he called the authorities Mr. Burns had no reason to suspect that the van or its occupants were engaged in any sort of illegal activity.  In other words, contend Defendants, both cases involve "fall[ing] into the trap of looking backwards to find out the corroboration in fact turned out to be true."   In this case, Mr. Burns never heard the van's occupants speak Spanish or any other language.  At no time did any of the occupants identify themselves, by any manner or by any means, as  non-citizens.  By his own admission at the hearing, Burns would have thought nothing more of

the matter and would not have contacted authorities had he not seen the newspaper headline as he walked out of the convenience store.  To quote his testimony:  *"...and truthfully I probably wouldn't have  done anything except the newspaper was right there saying it to me."*

The fact that Mr. Burns was an *identifiable* informant, however, somewhat distinguishes the facts of the instant case from those present in J.L.  Indeed, that the anonymity of the tip was critical to the reasoning in J.L. is evident from the following passage:

> Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, see Adams v. Williams, 407 U.S. 143, 146-147, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), "an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity," Alabama v. White, 496 U.S., at 329, 110 S.Ct. 2412. As we have recognized, however, there are situations in which an anonymous tip, suitably corroborated, exhibits "sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." Id., at 327, 110 S.Ct. 2412. The question we here confront is whether the tip pointing to J.L. had those indicia of reliability.

J.L., 529 U.S. at 270.  The J.L. Court answered that question by concluding that after-the-fact confirmation of the information's accuracy did not constitute an indicium of reliability sufficient to corroborate the anonymous tip.  In J.L., "[a]ll the police had to go on . . . was the bare report of an unknown, unaccountable informant . . . ." J.L., 529 U.S. at 271.  For that reason, it was not possible to assess the tipster's reputation or to hold him or her responsible if the allegations about J.L. proved to have been fabricated.  Id. at 270.  By

21

contrast, in the present case, both the tape recording of his call to the New Mexico State Police and the CAD report generated as a result of that call demonstrate that Gary Burns gave his name, his location, and his cellular telephone number.  [Exhs. 1, 2].  Accordingly, the first J.L. concern—reliability of an *anonymous* tipster—is not at issue here.[4]

The second concern underlying J.L. was  identified by our Circuit in United States v. Johnson.  That concern related to a tip's level of *specificit*y.  Johnson, 364 F.3d at 1191. Explaining that a nondescript tip could give police an excuse to stop and search a large number of people, the Court reasoned that "insistence on additional detail from the tipster and corroborating observation by the police helps ensure that police do not use vague tips to violate the Fourth Amendment rights of innocent citizens."  Id.  In Johnson, the tipster did not give his name and address but nevertheless provided the police dispatcher to whom he spoke with his cell phone number and stayed on the line for approximately eight minutes,

―――――――――――――

[4]  See also Easton v. City of Boulder, Colo., 776 F.2d 1441, 1449 (10th Cir. 1985). In Easton, a sexual-molestation case involving allegations made by child witnesses/victims, the Court explained that

> when examining informant evidence used to support a claim of probable cause for a warrant, or a warrantless arrest, the skepticism and careful scrutiny usually found in cases involving informants, sometimes anonymous, from the criminal milieu, is appropriately relaxed if the informant is an identified victim or ordinary citizen witness. Courts are much more concerned with veracity when the source of the information is an informant from the criminal milieu rather than an average citizen who has found himself in the position of a crime victim or witness.

22

describing the criminal activity he believed he was witnessing.[5] Id.  The appearance and location, "if not the threatening behavior,"[6] of the alleged perpetrator and his victim were then confirmed by the arresting officer.  Id.  Concluding that the "considerable detail" the caller provided "significantly circumscribed the number of people police could have stopped in reliance on it," the Court also remarked upon the "unlikel[ihood] that the tip would have given police a reason to stop any other couple in the state of New Mexico, let alone on a particular street in a high crime neighborhood in Albuquerque."  Id. n.3.

Such is the case here.  The specificity of the tip provided by Gary Burns virtually eliminated the possibility that police could have stopped any vehicle other than the van being operated by Defendants Madrona-Costa and Delgado.  Mr. Burns informed the dispatcher to whom he spoke that he was on the highway in Santa Rosa, and that he was reporting a white Ford[7] van with blacked out windows, California license plate number 5NVY479, which was headed west carrying 18 or 19 people.  [Testimony of Gary Burns; Exh. 1].

_____

[5]  The caller stated that he had just seen a middle-aged man forcing a pre-teen girl to walk down Copper and Pennsylvania Avenues in a part of Albuquerque known to police as "The War Zone" for its high levels of violent crime. The caller said he was still observing the pair and described their actions and appearance in detail, noting that the man appeared to be pushing and yelling at the girl and looking around for something, but that he did not see any weapons. Johnson, 364 F.3d at 1187.

[6]  At the suppression hearing held in Johnson, the arresting officer testified that he did not see the defendant touch the alleged victim in an aggressive manner and that, in fact, had it not been for the call from his dispatcher, nothing in the interaction that he observed between the defendant and the alleged victim would have aroused his suspicion.  United States v. Johnson, 267 F.Supp.2d 1072, 1074 (D.N.M. 2003).

[7]  The vehicle actually was a Chevrolet van.  [See Exh. 1].

However, the fact that the tipster was not anonymous and that he identified a specific vehicle as the subject of his suspicions does not end the Court's inquiry under the Fourth Amendment.  The Court must also consider whether the tipster conveyed any articulable basis for his suspicion that the vehicle's occupants were traveling in the United States illegally.  Because Officer Healy did not independently witness any suspicious activity while following Defendants' vehicle, the answer to this question turns on what information Mr. Burns conveyed to the dispatcher, Ms. Ray.

The evidence adduced at the suppression hearing does not persuade me that the information Mr. Burns conveyed to Ms. Ray gave rise to a reasonable suspicion of criminal activity sufficient to justify the stop of Defendants' van.  See Nix v. Williams, 467 U.S. 431, 444 n.5 (1984) (explaining that quantum of proof at suppression hearings is preponderance of the evidence).  As an initial matter, it should be noted that although Ms. Ray was the only New Mexico State Police dispatcher to whom  Mr. Burns spoke, Ms. Ray was not present and did not testify at the suppression hearing.  Further, the dispatcher who did testify acknowledged that both the police recording equipment and her computer were malfunctioning at the time of Burns' call.  To be sure, Mr. Burns testified (and the dispatcher's tape recording confirms) that he gave Ms. Ray enough specific information to identify the van that was the subject of his suspicions, including its color, license place number, blacked-out windows, location, direction of travel, and number of occupants. Beyond that information, however, I find that Mr. Burns did not convey enough specific

information about the *reasons* why he believed the van and its occupants were suspicious.

Although Ms. Leyba testified that she and dispatchers under her supervision will normally ask callers why they suspect that criminal activity is underway, neither the tape recording nor the CAD report in the present case reflect that Mr. Burns conveyed the reasons he suspected the van to be involved in illegal activity.   [See Exhs. 1 and 2]. According to Ms. Leyba, she dispatched Officer Healy on the basis of information that Mr. Burns had observed a white van that he believed to be carrying 18 undocumented immigrants.   [Testimony of Carmen Leyba].   But Ms. Leyba never spoke to Mr. Burns. Instead, Ms. Ray spoke to Mr. Burns and relayed to Ms. Leyba the information provided by him.   [Id.].   While Ms. Leyba testified that she would likely have asked Ms. Ray to ask Mr. Burns what caused him to suspect that the van occupants were illegal immigrants, the basis of Mr. Burns's opinion is not reflected either in the CAD report or on his taped conversation with Ms. Ray.   Under these circumstances I conclude that the Government has failed to demonstrated that dispatcher Ray, who took the call from Mr. Burns, had a reasonable suspicion sufficient to justify the stop.

Even assuming that Mr. Burns conveyed to Ms. Ray the substance of his testimony at the suppression hearing, that information does not add up to reasonable suspicion of illegal activity.   The apparent basis for Mr. Burns' suspicions that he articulated at the suppression hearing was that he saw a large number of Hispanic-looking people traveling in a van together under circumstances where one of the van's occupants was wearing a knife

and a "Boonie" hat, and appeared to be "guarding" the others.  These activities, alone or in combination, are not illegal.

While it is possible that such activities could, in combination with other facts, have significance to a reasonable police officer based on his or her training and experience in dealing with immigration matters, none of the law enforcement personnel who  testified in this case (Officer Healy, Ms. Leyba) articulated why they thought these activities were suspicious in this case, or how such activities factor into their training or experience in dealing with immigration issues.  Accordingly, I conclude that the Government has not met its burden of proving  that the stop of Defendants was based on a reasonable, articulable suspicion of criminal activity.

### III.   <u>CONCLUSION</u>

For the foregoing reasons,  and the reasons articulated on the record at the hearing on March 8, 2006, I conclude that the Government has not met its burden of proving that law enforcement agents  had reasonable suspicion to justify the stop of Defendants' van. Accordingly, Defendant Madrona-Costa's motion to suppress will be granted and Defendant Delgado's motion to join the suppression motion also will be granted.

**IT IS, THEREFORE, ORDERED** that *Defendant Madroza-Acosta's Motion to Suppress*  [Doc. 37] is **GRANTED**;

**IT IS FURTHER ORDERED** that Defendant Pedro Delgado's *Motion to Join in Defendant Jorge Madroza-Acosta's Motion to Suppress*  [Doc. 40] is **GRANTED**.

26

**SO ORDERED** this 10th day of March, 2006, in Albuquerque, New Mexico.


**M. CHRISTINA ARMIJO**
United States District Judge